UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

CHARLES MAX LIVINGSTON,

   Plaintiff,            Case No. 2:17-cv-103

v.                  HON. TIMOTHY P. GREELEY

COMMISSIONER OF SOCIAL SECURITY,

   Defendant.
_____/

## OPINION

   On June 3, 2013, Plaintiff Charles Max Livingston filed an application for disability benefits. (PageID.205). Plaintiff alleges that he has been disabled since June 1, 2013, because of: generalized anxiety disorder, attention deficit disorder (ADHD), deficient memory, irritable bowel syndrome (IBS), gastroesophageal reflux disease (GERD), a learning disability not otherwise specified (NOS), depression, and a possible receptive language disorder. (PageID.219). Plaintiff's application was initially denied, and he subsequently requested an administrative hearing before an Administrative Law Judge (ALJ). (PageID.106-110). The ALJ held a hearing on February 8, 2016. (PageID.62). In a decision issued on March 15, 2016, the ALJ concluded that Plaintiff was capable of performing past relevant work as a janitor and, therefore, not disabled under the Social Security Act. (PageID.41-54). The ALJ's decision became the agency's final decision on April 11, 2017, when the Appeals Council denied Plaintiff's request for review. (PageID.24). Plaintiff

then filed this action, seeking judicial review of the agency's final decision denying his request for disability benefits.[1]

Plaintiff was born on June 6, 1970, has a high school education, and lives with his wife and son. (PageID.64, 70, 205). He has a driver's license and is able to attend to his personal hygiene. (PageID.66). Plaintiff has not held a job since being fired as a laborer at a pet bedding company in March of 2012. After he was fired, Plaintiff did not seek other employment because of his mental health issues. (PageID.74). Plaintiff testified he has had mental health issues since he can remember and attended special education classes in school. (PageID.69). At the time of the hearing, Plaintiff was seeing Michael Varney, a Limited Licensed Psychologist and Certified Addiction Professional (CAP), once a week and his family doctor every two to three months for medications. (PageID.82). However, there are no treatment notes of the weekly therapy sessions with Mr. Varney. Plaintiff stated he has anxiety attacks five days a week and was prescribed Feldene, Vyvanse, Effexor, Ativan, Trazodone, and Zantac or other prescriptions for GERD. (PageID.81-83).

The findings of the ALJ are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jones v. Sec'y, Human and Health Serv.*, 945 F.2d 1365, 1369 (6th Cir. 1991). The ALJ's decision cannot be overturned if sufficient evidence supports the decision regardless of whether evidence also supports a contradictory conclusion. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). However, where the ALJ fails to follow agency rules and

---

[1] Both parties consented to proceed before a Magistrate Judge on September 11, 2017. (ECF No. 10).

regulations, the court should find that lack of substantial evidence exists to support the conclusion. *Miller v. Comm'r of Soc.*, No. 15-1405 (6th Cir., Jan. 29, 2016).

The ALJ must employ a five-step sequential analysis to determine if Plaintiff is under a disability as defined by the Social Security Act. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). If the ALJ determines Plaintiff is or is not disabled under a step, the analysis ceases and Plaintiff is declared as such. 20 C.F.R § 404.1520(a). If the ALJ can make a dispositive finding at any point in the review, no further finding is required. 20 C.F.R. § 404.1520(a). At step one, the ALJ determines whether the claimant can still perform substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether the claimant's impairments are considered "severe." 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairments meet or equal a listing in 20 C.F.R. part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to still perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). At step five, after considering the claimant's residual functional capacity, age, education, and work experience, the ALJ determines whether a significant number of other jobs exist in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v).

Plaintiff has the burden of proving the existence and severity of limitations caused by his impairments and that he is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

In this case, the ALJ found that Plaintiff's claim failed at step four of the analysis. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset date of June 1, 2013. (PageID.43). At step two, the ALJ found that Plaintiff suffered the severe impairments of Social Anxiety Disorder, Dependent Personality Disorder, Panic Disorder with Agoraphobia, Depression, Attention Deficit/Hyperactivity Disorder (ADHD), Post-Concussion Syndrome, Bipolar Disorder, Left Leg Tendonitis, Left Ankle Fracture, Gastroesophageal Reflux Disease (GERD), and Urinary Frequencey. (PageID.43-44). At step three, the ALJ found that Plaintiff's impairments did not meet or exceed the severity of one of the listed impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. (PageID.44). With respect to Plaintiff's mental impairments, the ALJ noted that Plaintiff had mild restrictions in activities of daily living, and moderate difficulties with social functioning and concentration, persistence, or pace. (PageID.45). At step four, the ALJ concluded that Plaintiff had the residual functional capacity to perform light work as defined under 20 C.F.R. § 404.1567(b) with the following limitations:

> [H]e can only occasionally climb ladders, ropes, and scaffolds and can no more than frequently climb ramps and stairs. The claimant can have no more than occasional exposure to hazards like dangerous machinery, unprotected heights and the like. He is limited to simple, routine, repetitive tasks, and he must be employed in a low-stress job (meaning a job that requires less than occasional decision-making and less than occasional changes in the work setting). The claimant must have work that is not at a production rate or pace. He can have no more than occasional interaction with the public and with co-workers (and no tandem tasks with any co-workers), and he can have no more than occasional supervision (which must be on-site). Finally, the claimant must be permitted to be off-task for five percent of the workday, for health reasons.

(PageID.46-47). The ALJ then concluded, "[Plaintiff] is capable of performing past relevant work as a Janitor. This work does not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity (20 C.F.R. 404.1565)." (PageID.53).

Plaintiff argues that the ALJ's hypothetical questions at the administrative hearing failed to adequately encapsulate Plaintiff's moderate limitations in concentration, persistence, or pace. In making this argument, Plaintiff confuses two separate points in the ALJ's decision. When considering the paragraph B criteria at step three, the ALJ determined that Plaintiff had moderate difficulties in regard to concentration, persistence, or pace. The ALJ stated:

> With regard to concentration, persistence, or pace, the claimant has moderate difficulties. In his Function Report, the claimant reported that his ability to pay attention was variable, though he said that he usually had trouble. He wrote that he had difficulty following instructions and was easily distracted. Still, he reported that he used a computer compulsively and with great skill. Intelligence Quotient (IQ) testing has shown the claimant to possess normal intelligence, though other tests have shown the claimant to be unusually distractible. (See Exhibits 5E, 5F, 7F). In April of 2015, the claimant reported that Vyvanse helped him to focus and keep his life together; later that year, he said that he had no significant complaints, aside from some increased sleepiness. (Exhibit 12F at 2-3, 34). A state agency psychological consultant who considered the claimant's subjective complaints and the report of the claimant's consultative examination (which included a mental status examination on which the claimant performed poorly) concluded that the claimant had moderate difficulties in maintaining concentration, persistence, or pace. (Exhibit 1A). The claimant testified that, when he was remodeling his home and was seeking to clear out mold, he had succeeded in removing all of it. He stated that he could do three loads of laundry in a row, performing various other tasks, such as cooking, while waiting for the washing and drying machines to complete their cycles. The evidence as a whole fails to establish the presence of marked difficulties in this area.

(PageID.45-46). "It is well established, however, that the paragraph B criteria used in determining whether a claimant meets or equals a listed impairment 'are not an RFC assessment,' but rather are 'used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation

5

process.'" *Hycoop v. Comm'r of Soc. Sec*, 2016 WL 4500794, at *4 (W.D. Mich. Aug. 29, 2016) (quoting SSR 96–8p, 1996 WL 374184, at *4 (S.S.A. July 2, 1996)). "RFC is a more detailed assessment made by 'itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorder listings in 12.00 or the Listing of Impairments.'" *Id.* Accordingly, the ALJ's findings at step three in the sequential analysis do not undermine the RFC determination at step four.

Nonetheless, the the ALJ's RFC assessment sufficiently addressed Plaintiff's moderate limitations in concentration, persistence, or pace. As stated above, the ALJ included six limitations in his RFC assessment: (1) can only occasionally climb ladders, ropes, and scaffolds and can no more than frequently climb ramps and stairs, (2) can have no more than occasional exposure to hazards like dangerous machinery, unprotected heights and the like, (3) is limited to simple, routine, repetitive tasks, and he must be employed in a low-stress job (meaning a job that requires less than occasional decision-making and less than occasional changes in work setting), (4) must have work that is not a production rate or pace, (5) can have no more than occasional interaction with the public and with co-workers (and no tandem tasks with any co-workers), and he can have no more than occasional supervision (which must be offsite), (6) must be permitted to be off-task for five percent of the workday, for health reasons. These limitations are consistent with the report of state agency psychological consultant Bruce G. Douglass. In his report, Dr. Douglass provided a narrative review of Plaintiff's sustained concentration, persistence capacities, and/or limitations:

> He is said to move at a slow pace. Concentration, pace, and persistence are mildly/moderately impaired, and workplace performance will vary with mood and/or distractibility in demanding work settings.

6

(PageID.100). Dr. Douglass also provided an additional explanation of Plaintiff's mental residual function capacity determination which included that "[t]he claimant retains the capacity to perform routine, 2-step tasks on a sustained basis." (PageID.101). In addition to Dr. Douglass's assessment, the ALJ offered an additional explanation for the RFC limitations:

> Though the claimant seemed to demonstrate some anxiety during the hearing (as might be expected), there is insufficient reason to conclude that the claimant's anxiety would prevent him from performing simple, routine, and repetitive tasks at a familiar worksite where there would be few stressors, little interpersonal contact, and no work at a production rate or pace. This would be especially true if the claimant were allowed to be off-task for five percent of the workday, as the present assessment envisions.

(PageID.51).

Further, the ALJ RFC assessment is based on all of the relevant evidence in the case record, including reports of daily activities. During the hearing, Plaintiff testified that he prepares "boxed" meals or "something that is readily easy and quick to make" such as chili, goulash, spaghetti, or hamburgers. (PageID.72). In addition, Plaintiff goes grocery shopping approximately once a week, though occasionally needs to make multiple trips because he forgets the grocery list, or to put things on it. (PageID.67-79). He is able to complete three consecutive loads of laundry while completing other tasks around the house. (PageID.71-72). Finally, Plaintiff testified that he not only used various social networking sites such as Facebook and email, but that he was capable of creating a sheet with the accounts marked on it to keep track of them. (PageID.73). The case record evidence provides substantial evidence to support that the ALJ's hypotheticals properly considered Plaintiff's limitations in concentration, persistence, and pace.

Plaintiff cites two cases in an attempt to establish that the ALJ erred when addressing Plaintiff's moderate difficulties in concentration, persistence, or pace. First, Plaintiff relies on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), in which the Sixth Circuit

stated: "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Id.* at 516. In that case, the Court held that moderate limitations in concentration, persistence, or pace must be encapsulated into the hypothetical question. *Id.* at 516-17. However, as previously stated, the ALJ's assessment was consistent with the report of Dr. Douglass, which found that Plaintiff retained the capacity to perform routine, 2-step tasks on a sustained basis. Moreover, the ALJ went further and provided additional limitations to encompass Plaintiff's moderate difficulties in difficulties in concentration, persistence, or pace.

Second, Plaintiff relies on the Seventh Circuit's decision in *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015). In that case, the court held that the ALJ's hypothetical question to the vocational expert (VE) was flawed because it failed to account for all of the plaintiff's concentration, persistence, or pace mental limitations. *Id.* at 813. Plaintiff is correct that some of limitations addressed in *Varga* are similar to the limitations imposed in this case. However, *Varga* is not binding on this Court. Furthermore, in this case, the ALJ imposed additional limitations that were not included in *Varga*. For example, the ALJ allowed Plaintiff to be off-task 5% of a typical workday for health reasons. And several courts in the Sixth Circuit have upheld a similar percentage for being off-task when a claimant has moderate limitations to concentration, persistence, or pace. *See, e.g.*, *England v. Comm'r of Soc. Sec.*, 2016 WL 8114219, at *8 (E.D. Mich. July 11, 2016) (8%); *McNalley v. Comm'r of Soc. Sec.*, 2011 WL 7445517 (N.D. Ohio Dec. 15, 2011) (5%). Accordingly, the ALJ's RFC assessment sufficiently addresses Plaintiff's moderate limitations in concentration, persistence, or pace.

Plaintiff also argues that the ALJ erred by failing to give adequate consideration and weight to the various medical opinions of record. Specifically, Plaintiff argues that the ALJ erred by according Dr. Douglass, a state agency psychological consultant examiner, substantial weight. Dr. Douglass evaluated Plaintiff's available medical evidence in assessing Plaintiff's mental residual functional capacity, including Dr. Kilpela's medical opinion. The ALJ stated that Dr. Douglass's opinion was given substantial weight because it was "consistent with the record as a whole." (PageID.52). Generally, an ALJ is permitted to rely on state agency physician's opinions to the same extent as she may rely on opinions from other sources. 20 C.F.R. § 404.1527. Thus, an ALJ may provide greater weight to a state agency physician's opinion when the physician's finding and rationale are supported by evidence in the record. *Id.*; see *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x. 267. 274-75 (6th Cir. 2015) (citing *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence."). Dr. Douglass's assessment that Plaintiff's "concentration, pace, and persistence are mildly/moderately impaired," that his "workplace performance will vary with mood and/or distractibility in demanding work settings," and that he "retains the capacity to perform routine, 2-step tasks on a sustained basis," is supported by the evidence on record, including the objective medical evidence and Plaintiff's testimony at the hearing. (PageID.100-101). Therefore, the ALJ gave appropriate weight to Dr. Douglass's evaluation.

Dr. Kilpela performed the earliest of Plaintiff's mental evaluations on September 30, 2013 at the request of the Social Security Administration. (PageID.50). Plaintiff asserts that the ALJ erred by assigning Dr. Kilpela's statements limited weight, arguing that his statements

were entitled to significant weight as an examining source whose opinions were based on his evaluation and testing of Plaintiff.

Medical opinions are to be weighed by the process set forth in 20 CFR § 404.1527(c) which directs that, generally, more weight is given to the medical opinion of a source who has examined a claimant than to the medical opinion of a medical source who has not examined a claimant. 20 CFR § 404.1527(c)(1). However, Dr. Kilpela's findings were not entitled to significant weight as Plaintiff asserts. At the outset, the rule states that "generally" weight is accorded in this fashion, rather than examining sources are "entitled" to more weight. Further, in addition to examining source status, an ALJ is also held to other factors in determining how to weigh medical opinions which include treatment relationship, supportability, consistency, specialization, and other factors. *See* 20 C.F.R. § 404.1527(c)(1-6). The ALJ specifically addressed his reasoning for assigning Dr. Kilpela's statements limited weight.

> The statements [by Dr. Kilpela] represent an appropriate response to the claimant's presentation at the consultative examination, where the claimant displayed significant anxiety. Still, his presentation on that occasion does not appear to have been typical for the claimant. It contrasts, for instance, with the claimant's presentation at Dr. Caldwell's evaluation and at the 2015 appointments at which his psychotropic medications were managed. Though the claimant seemed to demonstrate some anxiety during the hearing (as might be expected), there is insufficient reason to conclude that the claimant's anxiety would prevent him from performing simply, routine, and repetitive tasks at a familiar worksite where there would be few stressors, little interpersonal contact, and no work at a production rate or pace. This would be especially true if the claimant were allowed to be off-task for five percent of the workday, as the present assessment envisions. Notably, a May, 2015 treatment note suggests that the claimant required only very infrequent does of Ativan in order to get through the spring of that year.

(PageID.51). The ALJ also considered Dr. Kilpela's findings independently of Dr. Douglass's reviewing opinion in further detail. Therefore, the ALJ gave appropriate weight to Dr. Kipela's evaluation of Plaintiff.

Dr. Caldwell evaluated Plaintiff after Dr. Douglass's assessment. Plaintiff was referred to Dr. Caldwell by his nurse practitioner, Tracy Nelson, due to a reported history of memory difficulty. (PageID.327). Dr. Caldwell's testing was aimed at assessing memory and included a clinical interview of Plaintiff and his wife, a review of available medical records, and the completion of questionnaires and neuropsychological tests. (PageID.327, 333-34). Dr. Caldwell concluded that Plaintiff "showed variable speed, attention, and executive skills, and mild deficits in naming and memory for designs. Moderate to severe impairment was noted in sustained attention, visual organization, and memory for a list of words." (PageID.330-331). Plaintiff asserts that the ALJ made several errors in assessing Dr. Caldwell's evaluation of Plaintiff including that the ALJ never assessed Dr. Caldwell's opinion for weight.

Dr. Caldwell conducted a medical evaluation of Plaintiff and the ALJ considered the medical evidence provided by her accordingly. As Plaintiff asserts, the ALJ did not assign a specific weight to Dr. Caldwell's medical assessment. However, in his decision, the ALJ considered Dr. Caldwell's evaluation in detail.

> At the most recent [evaluation with Dr. Caldwell] the claimant was said to be well groomed and casually dressed, and while he was not certain of the exact date, he was otherwise fully oriented. Though he displayed reduced eye contact, the examiner stated that he otherwise followed social cues appropriately. The claimant's speech was normal, aside from occasional paraphasic errors. While the claimant's thought processes were said to be tangential, he was said to display no evidence of a formal thought disorder, and he denied suicidal ideation. The claimant's mood was reportedly anxious and depressed, but while his affect was said to be dysphoric initially, he was noted to display "increased positivity and humor" during the testing. The examiner noted that the claimant cooperated with all

> testing procedures and that he was able to sustain attention and concentration throughout the evaluation and to put forth adequate effort. The examiner said that the test results indicated that the claimant possessed average intelligence and intellectual skills and that he performed well on tests of visuospatial skills, language, and memory of stories and complex figures. Although he showed mild deficits in some other areas, the claimant showed moderate to severe impairment only with respect to sustained attention, visual organization, and remembering lists of words. [Dr. Caldwell also] recommended that claimant receive weekly psychotherapy or counseling for his anxiety and depression and employ various compensatory memory strategies. At a follow-up appointment the next month, the claimant displayed a blunted mood, but Dr. Caldwell noted that the claimant appeared to understand and appreciate the test results, as well as her recommendations.

(PageID.49-50).

The ALJ goes on to compare Dr. Caldwell's evaluation to that of the Plaintiff's counselor, Michael Varney, to whom the ALJ assigned "some weight". (PageID.50). The ALJ did not dismiss or ignore Dr. Caldwell's evaluation, but examined it thoroughly as part of Plaintiff's record as a whole and, thus, did not error in failing to specifically articulate the exact weight given to Dr. Caldwell's evaluation.

> Both Mr. Varney and Dr. Caldwell performed testing that was said to reveal some deficiencies with respect to memory. While Dr. Caldwell's nuanced discussion of the testing she administered suggest that those memory problems would not necessarily affect all aspects of the claimant's daily life, the difficulties would nonetheless appear likely to prevent the consistent performance of anything beyond simply, routine, and repetitive tasks. Because of their simple and repetitive nature, it is unlikely that the claimant's memory problems would prevent him from performing such tasks. Dr. Caldwell suggested that the most acute effects of the claimant's memory problems could be managed by employing compensatory strategies; she did not recommend formal cognitive therapy . . . Moreover, Mr. Varney's GAF score falls in a range that indicates the presence of moderate psychological symptoms or difficulties (that would not be expected to preclude all gainful employment). The score is consistent with the record as a whole, the conservative course of the claimant's mental health treatment (which has, for

instance, included no psychiatric hospitalizations), and the results of
the testing that Mr. Varney and Dr. Caldwell conducted.

(PageID.50).

Plaintiff also asserts that the ALJ used his own interpretation of Dr. Caldwell's findings in his RFC assessment and failed to build a logical bridge between his conclusion and Dr. Caldwell's assessment. The ALJ considered both Dr. Caldwell's assessment and Plaintiff's own testimony that he engages in a relatively wide range of daily activities such as driving, cooking simple meals, shopping, and doing other household chores. (PageID.50). After considering both Dr. Caldwell's evaluation in detail and Plaintiff's testimony, the ALJ concluded that "a person who regularly engages in these activities should be able to perform simple, routine, and repetitive tasks without the need for an unusual number of reminders from supervisors. (PageID.50). He further supported this conclusion with Plaintiff's GAF score. The ALJ provided a substantial analysis that would allow a court to "trace the path of his reasoning". *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). Further, the ALJ did not reject favorable evidence contained in Dr. Caldwell's evaluation as Plaintiff argues, but specifically included it in his hearing decision:

> While Dr. Caldwell's nuanced discussion of the testing she administered suggests that those memory problems would not necessarily affect all the aspects of the claimant's daily life, the difficulties would nonetheless appear likely to prevent the consistent performance of anything beyond simple, routine, and repetitive tasks.

(PageID.50.)

Plaintiff's argument that Dr. Caldwell's findings "would show at times, [Plaintiff's] ability to maintain attention and concentration would be marked, and he would have no useful ability to perform competitive employment" is also without merit. (PageID.541-542). Dr.

13

Caldwell noted in her summary and impressions of Plaintiff's evaluation that "Moderate to severe impairments [were] noted in sustained attention, visual organization, and memory for a list of words." (PageID.331). She also noted that Plaintiff's memory "appeared much better on certain tests today" and that this "[v]ariability in memory is likely partially due to executive deficits, but also would be consistent with a pattern of scores seen in individuals who are severely depressed and anxious, with the waxing and waning of performance as symptoms fluctuate throughout testing." (PageID.331-332). There is no evidence provided by Dr. Caldwell establishing that at times plaintiff would have *no* useful ability to perform competitive employment.

Plaintiff also argues that his WAIS IV processing speed score of 79, a test performed by Dr. Caldwell, contradicts Dr. Douglass's opinion. The processing speed index in the WAIS IV reflects an individual's ability to process simple or routine visual information quickly and measures visual and motor speed. A score of 79 is the highest possible score in the category of "borderline", which ranges from 70 to 79. *Weschsler Intelligence Scale*, Weschler Test (2018), https://wechslertest.com/about-wechsler/wechsler-intelligence-scale. As previously discussed, Dr. Douglass explained that Plaintiff retained the capacity to perform routine, 2-step tasks on a sustained basis. Plaintiff's WAIS IV score of 79 does not undermine Dr. Douglass's determination. Plaintiff falls into the highest score of the "borderline level." In addition, Dr. Caldwell estimated Plaintiff's intelligence was average and provided a more detailed assessment of Plaintiff's attention and processing speed. Dr. Caldwell's and Dr. Douglass's opinions, as noted by Plaintiff are consistent except to the degree of Plaintiff's of impairment. However, any difference in degree was resolved by the ALJ's thorough analysis in the decision.

In Plaintiff's final argument, he asserts that the ALJ did not consider his physical appearance at the various medical evaluations in light of Dr. Caldwell's statement that Plaintiff's

condition could fluctuate. During Dr. Kilpela's evaluation of Plaintiff in 2013, he noted that Plaintiff appeared "odd, wide eyed, and a bit dazed" and that "[if] the way [the claimant] presented today was indicative of how he would be in a social setting (like work), it would be difficult to imagine him being successful . . . It is not surprising that he has not been able to sustain employment." However, in 2014 during Dr. Caldwell's evaluation, Plaintiff was well-groomed, casually dressed, and other than being uncertain of the exact date, alert and fully oriented. Additionally, Plaintiff was able to sustain attention and concentration throughout the evaluation and put forth adequate effort across a wide range of tasks. Thus, the ALJ concluded that Plaintiff's unusual appearance during Dr. Kilpela's evaluation did not appear to be typical. The ALJ then accorded for the differences in presentation and both Dr. Caldwell's consideration of his performance ability depending on anxiety levels by including the RFC limitations of a low stress job, little interpersonal contact, no work at a production rate or pace, and allowance to be off-task for five percent of the workday. The ALJ's assessment of Dr. Caldwell's evaluation is supported by substantial evidence.

Accordingly, there is substantial evidence in the record that supports the Commissioner's decision that Plaintiff is not disabled as defined by the Social Security Administration. The decision of the Commissioner is AFFIRMED and Plaintiff's request for relief is DENIED.

Dated: September 19, 2018

    /s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE